UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUIS DIAZ VALDEZ, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TALKSPACE, INC., OREN FRANK, MARK HIRSCHHORN, HEC SPONSOR LLC, DOUGLAS L. BRAUNSTEIN, DOUGLAS G. BERGERON, JONATHAN DOBRES, ROBERT GREIFELD, AMY SCHULMAN, THELMA DUGGIN, HUDSON EXECUTIVE CAPITAL LP, and HEC MASTER FUND LP, | |
| Defendants. | |

Plaintiff Luis Diaz Valdez ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Plaintiff's counsel, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings by Talkspace, Inc. ("Talkspace" or the "Company") f/k/a Hudson Executive Investment Corporation ("HEIC") and securities analyst reports, press releases, and other public statements issued by, or about, the Company. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of a class consisting of (a) all persons or entities that purchased or otherwise acquired Talkspace securities between June 11, 2020 and November 15, 2021, both dates inclusive (the "Class Period"), and/or (b) all holders of

1

Talkspace common stock as of the record date for the special meeting of shareholders held on June 17, 2021 to consider approval of the merger between HEIC and Talkspace (the "Merger") and entitled to vote on the Merger (the "Class"); seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 and 14a-9 promulgated thereunder, against Defendants, and arising from the materially false or misleading statements or omissions issued during the Class Period and in the proxy statement issued in connection with the Merger (the "Proxy").

2.      Talkspace began as HEIC, a blank check company.  A blank check company is sometimes referred to as a special purpose acquisition company—or "SPAC"—and does not initially have any operations or business of its own.  Rather, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.  As a result, investors in blank check companies rely on the skill, transparency, and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

3.      Talkspace is a behavioral healthcare company that markets itself as being enabled by a "purpose-built technology platform."  Talkspace provides individuals and licensed therapists, psychologists, and psychiatrists with an online platform for one-on-one therapy delivered via messaging, audio, and video.  Talkspace's platform serves two different business channels: (i) business-to-consumer ("B2C"), comprised of individual consumers who subscribe directly on Talkspace's platform; and (ii) business-to-business ("B2B"), comprised of large enterprise clients

who offer their employees and insured members access to Talkspace's platform for free or at in-network reimbursement rates, respectively.

4.     On January 13, 2021, HEIC issued a press release announcing that it had entered into a merger agreement with Talkspace. As a result of the Merger, the owners of the pre-Merger Talkspace business were expected to own approximately 50.8% of the common stock of the combined Company, on a fully diluted net exercise basis.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Additionally, the Proxy omitted and/or misrepresented material information. Specifically, Defendants and the Proxy made false and/or misleading statements and/or failed to disclose that: (i) HEIC had overstated its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies; (ii) HEIC had conducted inadequate due diligence into then-private, pre-Merger Talkspace, or else ignored and/or failed to disclose multiple red flags concerning then-private, pre-Merger Talkspace's business and operations; (iii) Talkspace was experiencing significantly increased online advertising costs in its B2C business since the beginning of 2021; (iv) Talkspace was experiencing lower conversion rates in its online advertising in its B2C business; (v) as a result of (iii) and (iv) above, Talkspace was experiencing increased customer acquisition costs and more tepid B2C demand than represented to investors; (vi) as a result of (iii)-(v) above, Talkspace was suffering from ballooning customer acquisition costs and worsening growth and gross margin trends; (vii) Talkspace had overvalued its accounts receivables from certain of its health plan clients in its B2B business, which amounts required adjustment downward; and (viii) as a result of (iii)-(vii) above, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

6.      On the basis of the defective Proxy, on June 17, 2021, HEIC shareholders voted to approve the Merger at a special shareholder meeting.  Following the consummation of the Merger on June 22, 2021, HEIC changed its name to "Talkspace, Inc."

7.      On August 9, 2021, after the market closed, HEIC, which had been renamed Talkspace following the June 22, 2021 Merger close, issued a press release announcing the Company's financial results for the second quarter of 2021 ("Q2 2021").  That same day, Talkspace held a conference call to discuss the Company's Q2 2021 results.  On the call, Defendants revealed some issues relating to increased customer acquisition costs due to rising digital advertising costs while downplaying their impact, and confirmed a material increase in customer acquisition costs since the beginning of the year.

8.      On this news, Talkspace's stock price fell $1.11 per share, or 18.72%, to close at $4.82 per share on August 10, 2021.  Despite this decline in the Company's stock price, Talkspace securities continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements or omissions regarding Talkspace's true financial condition and prospects.

9.      Then, on November 15, 2021, after the market closed, Talkspace issued a press release announcing the Company's financial results for the third quarter of 2021 ("Q3 2021").  The press release disclosed, *inter alia*, that "[i]n the third quarter we increased the allowance for credit losses on receivables by $3.4 million, of which $2.8 million related to prior quarters"; that a "slowdown in the B2C business resulted in part from delays in launching new products and features, as well as a decline in conversion rates"; that "[g]ross profit was $14.2 million in the third quarter, compared to $15.1 million in the prior-year quarter"; that "[g]ross margin was 54% compared to 70% a year ago"; and that "[t]his decline was due to the increase in the reserve for

credit losses on receivables, revenue mix shift towards B2B, and continued investment in W2 therapist network."

10.     In a separate press release issued the same day, Talkspace announced that, effective immediately, Defendant Oren Frank ("Frank") was stepping down from his position as Chief Executive Officer ("CEO") and as a member of Talkspace's Board of Directors (the "Board"). Likewise, his wife Roni Frank was stepping down from her position as Head of Clinical Services and a Board member, effective that day.

11.     Talkspace also held a conference call after the market had closed to discuss the Company's disappointing Q3 2021 results.   In his prepared remarks, Defendant Douglas L. Braunstein ("Braunstein") acknowledged: "[T]he overall financial results for the third quarter came in below expectations management shared with investors on our last earnings call. We are obviously disappointed by this performance and we have to do better."

12.     Following these press releases and the Q3 2021 conference call, Talkspace's stock price fell $1.23 per share, or 36.28%, to close at $2.16 per share on December 16, 2021.

13.     Subsequent to, and due to, the closing of the Merger, the price of Talkspace common stock declined precipitously as the truth about Talkspace and the Proxy's false and misleading nature were revealed over time.   By December 30, 2021, the price of Talkspace common stock was trading below $2 per share, 80% below the price shareholders would have received if they had redeemed their shares instead of approving the Merger less than one year earlier.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)), SEC Rules 10b-5 and 14a-9 promulgated thereunder (17 C.F.R. §§ 240.10b-5, 240.14a-9), and 28 U.S.C. § 1331.  This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the U.S.

16.     Venue is proper in this Judicial District under Section 27 of the Exchange Act (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)-(d)).  Talkspace maintains its principal executive offices in this Judicial District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the NASDAQ GS ("NASDAQ"), a national securities exchange.

## PARTIES

18.     Plaintiff acquired Talkspace securities at artificially inflated prices during the Class Period and/or held Talkspace common stock as of the May 19, 2021 record date and was entitled to vote on the Merger at the June 17, 2021 special meeting of shareholders.  Plaintiff has suffered damages due to Defendants' violations of the Exchange Act alleged herein.

19.     Defendant Talkspace[1] is a behavioral healthcare company with headquarters in New York, New York.  Talkspace common stock and warrants are traded publicly on the

---

[1] "Talkspace" as used herein also refers to the business and operations of the Company.  Prior to the Merger, Talkspace was a private company but merged with and into the Company as a result of the Merger.

NASDAQ under the ticker symbols "TALK" and "TALKW," respectively.  Prior to the Merger, Talkspace was named "Hudson Executive Investment Corporation," and its stock, warrants, and ownership units were traded publicly on the NASDAQ under the ticker symbols "HEC," "HECCW," and "HECCU," respectively.

20.     Defendant Frank co-founded Talkspace in 2012 with his wife Roni Frank and served as its CEO and as a director following the Merger.  On November 15, 2021, the Company announced Frank and his wife, who was Head of Clinical Services and a Company director at the time, were stepping down from their roles effective immediately.

21.     Defendant Mark Hirschhorn ("Hirschhorn") served as President and Chief Operating Officer of Talkspace starting in February 2020.  He also served as Talkspace's Chief Financial Officer ("CFO") from February 2020 until July 25, 2021.  On November 22, 2021, the Company announced Hirschhorn's immediate resignation following an internal review of unspecified misconduct the week prior.

22.     Defendant HEC Sponsor LLC ("HEC Sponsor") served as the blank check sponsor of Talkspace.

23.     Defendant Braunstein was the co-founder, President, and Chairman of HEIC at the time of the Merger.  Braunstein was also a member of the HEC Sponsor, a beneficial owner of shares held by the HEC Sponsor, and shared voting and investment discretion with respect to the common stock held of record by the HEC Sponsor.  After the Merger, Defendant Braunstein served as Chairman of the Board and was subsequently appointed interim CEO, effective November 15, 2021, upon Defendant Frank's resignation.  Braunstein also founded Defendant Hudson Executive Capital LP ("HEC") and serves as its co-managing partner.  Significantly, Braunstein's wife, Sam Braunstein, served as Chief Marketing Officer of Talkspace before and after the Merger.  Through

his wife, Braunstein had unique access to Talkspace's business, operations, and prospects prior to the Merger, including the adverse facts concealed from investors as alleged herein.

24.     Defendant Douglas G. Bergeron ("Bergeron") was CEO and a director of HEIC at the time of the Merger.  Bergeron was also a member of the HEC Sponsor, a beneficial owner of shares held by the HEC Sponsor, and shared voting and investment discretion with Defendant Braunstein with respect to the common stock held of record by the HEC Sponsor.  He is also a managing partner of HEC.

25.     Defendant Jonathan Dobres ("Dobres") was the CFO of HEIC at the time of the Merger.

26.     Defendant Robert Greifeld ("Greifeld") was a director of HEIC at the time of the Merger.

27.     Defendant Amy Schulman ("Schulman") was a director of HEIC at the time of the Merger.

28.     Defendant Thelma Duggin ("Duggin") was a director of HEIC at the time of the Merger.

29.     Defendant HEC is an investment advisory firm founded by Braunstein and co-managed by Braunstein and Bergeron for the purposes of creating SPACs and effectuating blank check initial public offerings and mergers.  At the time the Merger was announced, HEC managed over $1.5 billion in assets.  HEC founded HEIC and launched and controlled the HEC Sponsor for the benefit of Defendants Braunstein and Bergeron.

30.     Defendant HEC Master Fund LP ("HEC Fund") is an investment fund established by HEC for the purpose of allowing HEC, Braunstein, and Bergeron to invest in and otherwise enter into contractual relationships with HEIC for their own pecuniary interests.  In connection

with the Merger, HEC Fund entered into a forward purchase agreement with HEIC, as amended on January 12, 2021, pursuant to which HEC Fund agreed to: (1) purchase 2,500,000 Forward Purchase Units (consisting of one share of Class A common stock and one-half of one warrant to purchase one share) for $10 per unit; and (2) backstop up to $25,000,000 of shareholder redemptions by HEIC stockholders.

31.     Defendants HEC, HEC Sponsor, HEC Fund, Braunstein, Bergeron, Dobres, Greifeld, Schulman, and Duggin are collectively referred to herein as the "Blank Check Sponsor Defendants."

32.     Defendants Frank, Hirschhorn, Braunstein, Bergeron, Dobres, Greifeld, Schulman, and Duggin are collectively referred to herein as the "Individual Defendants."  Because of the Individual Defendants' management positions with respect to HEC, the HEC Sponsor, HEIC and/or Talkspace, and relevant stock ownership, they each had authority over the information contained in the Proxy.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Talkspace began as HEIC, a blank check company formed by the Blank Check Sponsor Defendants.  A blank check company is sometimes referred to as a SPAC and does not initially have any operations or business of its own.  Rather, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.  As a result, investors in blank check companies rely on the skill, transparency, and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

34.     Talkspace is a behavioral healthcare company that markets itself as being enabled by a "purpose-built technology platform."  Talkspace provides individuals and licensed therapists, psychologists, and psychiatrists with an online platform for one-on-one therapy delivered via messaging, audio, and video.  Talkspace's platform serves two different business channels: (i) B2C, comprised of individual consumers who subscribe directly on Talkspace's platform; and (ii) B2B, comprised of large enterprise clients such as Google and Expedia and large health plans and employee assistance programs (collectively "health plan clients") such as Aetna, Cigna, Premera, Humana, and Optum, who offer their employees and insured members access to Talkspace's platform for free or at in-network reimbursement rates, respectively.

35.     On or about June 11, 2020, HEIC completed its initial public offering, selling 41.4 million ownership units (including the issuance of 5.4 million units as a result of the underwriters' exercise of their full overallotment option) to investors at $10 per unit for gross proceeds of $414 million (the "IPO").  Each unit consisted of one share of Class A common stock and one-half of one redeemable warrant, with each whole warrant exercisable to purchase one share of Class A common stock at a price of $11.50 per share, subject to certain adjustments.  The IPO was sponsored by Defendant HEC Sponsor, an affiliate of Defendant HEC.

**Materially False and Misleading Statements and Omissions Issued During the Class Period and in the Proxy Statement for the Merger**

36.     On May 21, 2020, HEIC filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after amendment, was declared effective by the SEC on June 8, 2020 (the "Registration Statement").

37.     On June 10, 2020, HEIC filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

38.     The Class Period begins on June 11, 2020, when HEIC's securities began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions contained in the Offering Documents.  While HEIC did not identify any target companies at the time of the IPO, the Offering Documents stated that the Company intended to focus its search for an initial business combination in two industry sectors: (i) financial services, with a focus on financial technology; and (ii) healthcare, including healthcare information technology, services, and products.  The Offering Documents claimed that HEIC's "management team's direct industry expertise, operational experience and strategic backgrounds, our relationship with Hudson Executive Capital, and our management team's and Hudson Executive Capital's network of relationships and executives . . . provide us with a competitive advantage in both of our intended industry sectors of focus."  The Offering Documents explained further:

> In particular, we believe we will benefit from our access to Hudson Executive Capital's network of more than 30 current and former public company chief executive officers and other senior executives, which we refer to as the CEO Network, many of whom have been members of such network since Hudson Executive Capital's inception and the majority of whom are current or past leaders in the financial services or healthcare industries . . . . The CEO Network provides Hudson Executive Capital with unique idea generation, proprietary transaction sourcing, perspective and support during target due diligence, operating experience and participation in or recommendations for management and director roles, as well as execution resources.

39.     The Offering Documents listed the "Investment Criteria" HEIC would purportedly use to evaluate target companies including:

- Companies with an attractive valuation with multiple drivers for future growth.

- Companies that have a sustainable competitive advantage within a target market as a result of differentiated technology, distribution capabilities, customer service, or other attributes that provide high barriers to entry. The target business should have characteristics that are difficult to replicate and have multiple areas for growth.

- Companies that have a highly visible revenue model, good underlying growth prospects, and strong operating margins leading to strong and sustainable free cash flow capabilities.

- Companies where the collective capabilities of HEIC's management can be leveraged to tangibly improve the operations and create value.

- Companies that are small- to mid-sized businesses.

- Companies who understand the benefits of being public.

40.     Pursuant to the IPO prospectus, HEIC was required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust within 24 months of HEIC's IPO.  In the event HEIC did not timely complete an initial business combination, the Company was obligated to redeem 100% of its outstanding public shares equal to the aggregate proceeds remaining in trust, plus interest.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a deal would not be economically feasible.

41.     However, if HEIC was successful in timely completing an initial business combination, the Blank Check Sponsor Defendants would be richly rewarded.  Specifically, HEIC had issued founder shares in connection with the IPO equal to approximately 20% of the Company's outstanding common shares after the IPO (including the full exercise of the underwriter's overallotment option).  Essentially all of these founder shares were held by Defendant HEC Sponsor.  According to HEIC, these founder shares had a market value of $102.5 million as of the shareholder record date for the Merger, but would expire worthless if the Company failed to complete its initial business combination in time.  In addition, HEC Sponsor had purchased $10.28 million worth of private placement HEIC warrants prior to the Merger, which would be negatively impacted by a failure to consummate an initial business combination

(*i.e.*, by rendering the warrant worthless).  As a result, the Blank Check Sponsor Defendants were highly incentivized to complete an initial business combination and to convince shareholders to approve the Merger.

42.     On January 13, 2021, HEIC issued a press release announcing that it had entered into a merger agreement with Talkspace, to be funded by $414 million in cash in trust from HEIC's IPO, HEIC common stock, $300 million of gross proceeds from a Private Investment in Public Equity equity transaction, a $25 million forward purchase agreement by HEC Fund to purchase stock and warrants, and a $25 million commitment by HEC Fund to backstop redemptions.  As a result of the Merger, the owners of the pre-Merger Talkspace business were expected to own approximately 50.8% of the common stock of the combined Company, on a fully diluted net exercise basis.  The press release described Talkspace as a "'purpose-built technology company designed to meet the unmet medical needs in behavioral health by improving access, decreasing costs, improving outcomes, and creating value for patients, providers, and employers.'"  The press release also highlighted Talkspace's purportedly robust growth: "Talkspace has seen robust user growth with approximately 46,000 active members, and more than 39 million lives covered by employer or healthcare insurance agreements."  The press release further stated that Talkspace was on track to continue this growth for the remainder of the year, stating: "For 2021, Talkspace's estimated net revenue is $125 million, up approximately 69% from 2020 estimated net revenue."

43.     On February 2, 2021, HEIC filed the registration statement and draft proxy for the Merger on Form S-4 with the SEC, which, after several amendments, was incorporated into a final prospectus and proxy statement filed with the SEC, and declared effective, on May 28, 2021 (the "Proxy").  Defendants Braunstein, Bergeron, Dobres, Greifeld, Schulman, and Duggin signed the Proxy; the Proxy included information about Talkspace provided by Defendants Frank and

Hirschhorn; and the Blank Check Defendants reviewed, prepared, and had ultimate authority over the contents of the Proxy.

44.    The Proxy stated that the Board recommended shareholders vote to approve the Merger at the special meeting of shareholders scheduled for June 17, 2021.  The Proxy stated:

*"After careful consideration, the [HEIC] Board has determined that the [Merger and its related shareholder proposals] are fair to and in the best interests of [HEIC] and its stockholders and unanimously recommends that you vote or give instruction to vote"* [2] *in favor thereof.*

45.    The Proxy added:

The [HEIC] Board considered the results of the due diligence review of Talkspace's business. The [ HEIC] Board also considered Talkspace's current prospects for growth. For additional information, see *"Proposal No. 1 – The Business Combination Proposal – [HEIC's] Board of Directors' Reasons for Approval of the Transactions.*"

***As a result, [HEIC] believes that a business combination with Talkspace will provide [HEIC] stockholders with an opportunity to participate in the ownership of a company with significant growth potential.*** Please see the section entitled *"Proposal No. 1 – The Business Combination Proposal – [HEIC's] Board of Directors' Reasons for Approval of the Transactions.*"

46.    In the section entitled *"Proposal No. 1 – The Business Combination Proposal – [HEIC's] Board of Directors' Reasons for Approval of the Transactions,*" the Proxy explained the Board's rationale for recommending the Merger, noting, among other reasons:

- ***Attractive Valuation****. As more fully described under "**Comparable Company Analysis,**" the purchase price values Talkspace at a discount to selected comparable companies with respect to Talkspace's pro forma implied estimated revenue (for 2021E and 2022E), estimated gross profit (for 2021E and 2022E), actual revenue and estimated revenue compound annual growth rate (from 2019A through 2023E)*.

- ***Reasonableness of Aggregate Consideration****. Following a review of the financial data provided to [HEIC], including Talkspace's historical financial statements and certain unaudited prospective financial

---

[2] Unless stated otherwise, all emphasis is added throughout the complaint.

information, as well as [HEIC's] due diligence review of the Talkspace business and the views of [HEIC's] financial and other advisors, *the [HEIC] Board considered the aggregate consideration to be paid and determined that the aggregate consideration was reasonable in light of such data and financial information.*

- *Business and Financial Condition and Prospects. After conducting extensive due diligence, along with their familiarity with Talkspace's business from prior commercial experiences, the [HEIC] Board and [HEIC] management had knowledge of, and were familiar with, Talkspace's business, financial condition, results of operations and future growth prospects.* The [HEIC] Board considered the results of the due diligence review of Talkspace's business, including its comprehensive and diverse data, intellectual property and network assets, its payor customers, its ability to enhance, extend and expand its platform, the potential impact of COVID-19 on its business, as well as the legal due diligence performed by Milbank LLP, the quality of earnings prepared by KPMG LLP and the financial due diligence conducted by [HEIC's] management.

* * *

- *Talkspace's Growing Customer Base. [HEIC] and Talkspace forecasted that the number of total business to customer subscribers will increase from 19,851 in 2019, to 31,214 in 2020, 46,259 in 2021, 71,001 in 2022 and 85,829 in 2023.* [HEIC] and Talkspace additionally forecasted that the number of total business to business eligible lives will increase from 6,725,000 in 2019, to 39,285,000 in 2020, 65,341,000 in 2021, 129,093,000 in 2022 and 174,218,000 in 2023.

* * *

- *Talkspace Being an Attractive Target. The [HEIC] Board considered the fact that Talkspace* (i) is of a size relevant to the public marketplace, (ii) has a strong existing management team, (iii) *has a significant total addressable market and growth expansion opportunities*, (iv) provides an opportunity for operational improvement and (v) would benefit from the consummation of the Transactions as a result of becoming a public company and deleveraging, which the [HEIC] Board believed would improve Talkspace's ability to grow, including through acquisitions.

47.    The Proxy also noted that HEIC's Board relied on the following forecasted financial information for Talkspace, which was provided to HEIC by Talkspace management, and was reiterated in the Proxy to shareholders:

| (in millions, except active members and percentages) | Calendar Year Ending December 31, 2020E | | Calendar Year Ending December 31, 2021E | | Calendar Year Ending December 31, 2022E | | Calendar Year Ending December 31, 2023E | |
|---|---|---|---|---|---|---|---|---|
| Total business to consumer active members | | 31,214 | | 46,259 | | 71,001 | | 85,829 |
| Total business to business eligible lives (in thousands) | | 39,285 | | 65,341 | | 129,093 | | 174,218 |
| Net revenue | $ | 74 | $ | 125 | $ | 205 | $ | 285 |
| Percentage growth | | 94% | | 69% | | 64% | | 39% |
| Gross profit | $ | 47 | $ | 80 | $ | 129 | $ | 176 |
| Percentage margin | | 63% | | 64% | | 63% | | 62% |
| Operating expenses | $ | (62) | $ | (93) | $ | (114) | $ | (134) |
| EBITDA (1) | $ | (15) | $ | (12) | $ | 14 | $ | 42 |

48.     The Proxy additionally included generic risk statements about the Company's ability to attract new B2C customers and the advertising expenses relating to doing so.  For example, in the Proxy's "Risk Factors" disclosures, the Proxy stated:

> *Our business and the markets we operate in are new and rapidly evolving, which makes it difficult to evaluate our future prospects and the risks and challenges we may encounter*.

> These risks and challenges include our ability to:

> - *attract new clients and members to our platform and position our platform as a convenient and accepted way to access therapy and psychiatry*;

> * * *

> - *attract new and existing clients and members to rapidly adopt new offerings on our platform; [and]*

> * * *

> - *effectively manage our growth and business operations.*

49.     As an additional "Risk Factor," the Proxy disclosed:

> *Our future growth and profitability of our business will depend in large part upon the effectiveness and efficiency of our marketing efforts, and our ability to develop brand awareness cost-effectively.*

> *Our business success depends on our ability to attract and retain clients and members, which significantly depends on our marketing practices. Our future growth and profitability will depend in large part upon the effectiveness and efficiency of our marketing efforts, including our ability to:*

16

- ***create greater awareness of our brand***;

- identify the most effective and efficient levels of ***spending in each market, media and specific media vehicle***;

- determine the appropriate creative messages and media mix for advertising, marketing and promotional expenditures;

- ***effectively manage marketing costs (including creative and media) to maintain acceptable consumer acquisition costs***;

- select the most effective markets, media and specific vehicles in which to advertise; and

- ***convert consumer inquiries into clients and members***.

***We believe that developing and maintaining widespread awareness of our brand in a cost-effective manner is critical to achieving widespread adoption of our solution and attracting new clients and members. Our brand promotion activities may not generate consumer awareness or increase revenue, and even if they do, any increase in revenue may not offset the expenses we incur in building our brand. If we fail to successfully promote and maintain our brand, or incur substantial expenses in doing so, we may fail to attract or retain clients and members necessary to realize a sufficient return on our brand-building efforts or to achieve the widespread brand awareness that is critical for broad adoption of our brands***.

50.     Additionally, the Proxy included unaudited pro forma condensed financial information.  Included within that information, the Proxy listed, as an asset for Talkspace, accounts receivable of $7,580,000 as of March 31, 2021.

51.     The statements referenced in ¶¶ 38-39, 42, and 44-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Additionally, the Proxy omitted and/or misrepresented the material information set forth below in contravention of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.  Specifically, the Proxy and Defendants made false and/or misleading statements and/or failed to disclose that: (i) HEIC had overstated its competitive advantage and due diligence capabilities with respect to

Case 1:22-cv-00840-PGG   Document 1   Filed 01/31/22   Page 18 of 38

identifying and effectuating a merger with target companies; (ii) HEIC had conducted inadequate due diligence into then-private, pre-Merger Talkspace, or else ignored and/or failed to disclose multiple red flags concerning then-private, pre-Merger Talkspace's business and operations; (iii) Talkspace was experiencing significantly increased online advertising costs in its B2C business since the beginning of 2021; (iv) Talkspace was experiencing lower conversion rates in its online advertising in its B2C business; (v) as a result of (iii) and (iv) above, Talkspace was experiencing increased customer acquisition costs and more tepid B2C demand than represented to investors; (vi) as a result of (iii)-(v) above, Talkspace was suffering from ballooning customer acquisition costs and worsening growth and gross margin trends; (vii) Talkspace had overvalued its accounts receivables from certain of its health plan clients in its B2B business, which amounts required adjustment downward; and (viii) as a result of (iii)-(vii) above, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

52.     Furthermore, with respect to the Proxy, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303") required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."  The failure of the Proxy to disclose the fact that Talkspace was suffering heightened online advertising and customer acquisition costs, lower conversion rates, and more tepid demand in its B2C business and worsening growth and gross margin trends violated Item 303 because these undisclosed facts were known to Defendants and would (and did) have an

unfavorable impact on the Company's sales, revenues, and income from continuing operations. These failures also violated Item 105 because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Talkspace securities speculative or risky.

## The Truth Begins to Emerge

53.     On the basis of the defective Proxy, on June 17, 2021, HEIC shareholders voted to approve the Merger at a special shareholder meeting.  Following the consummation of the Merger on June 22, 2021, HEIC changed its name to "Talkspace, Inc."

54.     On August 9, 2021, after the market closed, HEIC, which had been renamed Talkspace following the June 22, 2021 Merger close, issued a press release announcing the Company's financial results for Q2 2021.  That same day, Talkspace held a conference call to discuss the Company's Q2 2021 results.  The call was overseen by Defendants Frank and Hirschhorn.  On the call, Frank revealed some of the issues relating to increased customer acquisition costs (sometimes referred to as "CAC") due to rising digital advertising costs while downplaying their impact.  For example, Defendant Frank stated, in relevant part, as follows:

> *While our B2C revenue grew substantially, we and many of our peers are experiencing elevated customer acquisition cost, due mainly to a material increase in the cost of digital advertising.*
>
> *As a result of this environment, we're taking a number of steps which we believe further strengthens our business: First, we increased our advertising budget, which . . . we believe will ultimately increase members retention, engagement and satisfaction.*

55.     Defendant Hirschhorn confirmed the material increase in customer acquisition costs since the beginning of the year, stating, in relevant part, as follows:

> Adjusted EBITDA loss was $12 million in the second quarter 2021 compared to the loss of $300,000 in second quarter 2020. *As Oren mentioned, CAC has been meaningfully elevated since the beginning of the year relative to prior*

*periods. **The majority of the excess losses in the quarter relative to initial expectations can be attributed to this increase in customer acquisition cost. While advertising costs have dramatically increased during the first-half of this year**, the current environment makes it more difficult to predict when customer acquisition costs will ultimately normalize. As such we will not be providing any update to guidance on EBITDA for the remainder of the year.*

56.     Likewise, in response to an analyst question concerning the fact that the number of active members in the B2C channel was down sequentially from the first quarter of 2021 (and thus below expectations), Hirschhorn stated, in relevant part, as follows:

> Sure. We were very deliberate this quarter, and we continue to really focus on the fact that there's really punitive pricing in the market today, there is a tremendous price disparity in customer acquisition costs this year, as composed – as compared to where we were in the second quarter of 2020. The frequency of price increases is somewhat dramatic from Facebook, and Google and the other digital properties. And we are spending what we believe is appropriate to maintain our competitive advantage in our leading brand, but we are going to continue to look to, obviously, now diversify our acquisition channels through investments in non-traditional channels as well as looking to partner with some of the nation's leading companies. I think the – it's unlikely that we are going to see a dramatic shift downward in the next quarter or two, but we do believe that CAC will stabilize, because these are, quite frankly, levels – I'd say, elevated levels that we don't believe are sustainable, nor have we ever seen increases like this since this – really since this, I'd say, past two to three years has and we've been tracking this clearly over the last five years.

57.     On this news, Talkspace's stock price fell $1.11 per share, or 18.72%, to close at $4.82 per share on August 10, 2021.  Despite this decline in the Company's stock price, Talkspace securities continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements or omissions regarding Talkspace's true financial condition and prospects.

58.     For example, in the August 9, 2021 press release, Talkspace ***reaffirmed*** its prior fiscal year 2021 net revenue guidance of $125 million and stated the Company's outlook for net revenue for Q3 2021 was $32 million.  The press release further quoted Defendant Frank discussing the Company's Q2 2021, stating, in relevant part, as follows:

"*We continued to experience broad-based momentum throughout our business in the second quarter, driven by significant demand tailwinds and a generational shift to virtual care. Our differentiated and comprehensive product portfolio continues to resonate in the marketplace, and we are seeing traction in both expanding our offering within existing clients as well as adding new clients. We are ideally positioned to address the vast, unmet and growing demand for mental health services in innovative ways, and we are excited to keep executing on our strategy*."

59.    Similarly, during the August 9, 2021 conference call, Defendant Frank stated, in relevant part, as follows:

> *Our $31 million in net revenue for the second quarter was a quarterly record for the company and represents 73% year-over-year growth. B2C net revenue for the second quarter was $21 million, up 36% year-over-year, and up 14% sequentially. Of particular note, our B2B revenue grew 320% year-over-year to $10 million. And we have a robust pipeline of B2B clients in revenue opportunities. As a result, we are on track to meet our revenue guidance of $125 million, growing our revenue by 64% for the fiscal year of 2021.*

60.    The statements referenced in ¶¶ 54-56 and 58-59 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) HEIC had overstated its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies; (ii) HEIC had conducted inadequate due diligence into then-private, pre-Merger Talkspace, or else ignored and/or failed to disclose multiple red flags concerning then-private, pre-Merger Talkspace's business and operations; (iii) Talkspace was experiencing significantly increased online advertising costs in its B2C business since the beginning of 2021; (iv) Talkspace was experiencing lower conversion rates in its online advertising in its B2C business; (v) as a result of (iii) and (iv) above, Talkspace was experiencing increased customer acquisition costs and more tepid B2C demand than represented to investors; (vi) as a result of (iii)-(v) above, Talkspace was suffering from ballooning customer

acquisition costs and worsening growth and gross margin trends; (vii) Talkspace had overvalued its accounts receivables from certain of its health plan clients in its B2B business, which amounts required adjustment downward; and (viii) as a result of (iii)-(vii) above, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

## The Truth Fully Emerges

61.     On November 15, 2021, after the market closed, Talkspace issued a press release announcing the Company's financial results for Q3 2021.  The press release stated, in relevant part, as follows:

> "While Net Revenue grew 23% year-over-year, driven by continued momentum in the B2B business, the overall financial results for the third quarter were disappointing. Q3 Net Revenue came in below management expectations due to a lower number of B2C customers and a one-time non-cash reserve adjustment for credit losses on receivables related to prior periods."

62.     The press release further stated, in relevant part, as follows:

- Net Revenue . . . came in below expectations due to a lower number of acquired customers in the direct-to-consumer business and an adjustment to reserves, which was only partially offset by growth in the B2B Gross Revenue.

- ***In the third quarter we increased the allowance for credit losses on receivables by $3.4 million, of which $2.8 million related to prior quarters***. Excluding the impact of this one-time non-cash adjustment, consolidated Revenue would have been $29.2 million, up 37% year-over-year.

- Direct-to-consumer Revenue was $18.6 million, a 10% year-over-year increase in the third quarter. ***The slowdown in the B2C business resulted in part from delays in launching new products and features, as well as a decline in conversion rates***.

* * *

- ***Gross profit was $14.2 million in the third quarter, compared to $15.1 million in the prior-year quarter. Gross margin was 54% compared to 70% a year ago. This decline was due to the increase in the reserve for credit losses on receivables, revenue mix shift towards B2B, and continued investment in W2 therapist network***.

63.     In a separate press release issued the same day, Talkspace announced that, effective immediately, Defendant Frank was stepping down from his position as CEO and as a Board member.  Likewise, his wife Roni Frank was stepping down from her position as Head of Clinical Services and a Board member, effective that day.

64.     Talkspace also held a conference call after the market had closed to discuss the Company's disappointing Q3 2021 results.  The call was overseen by Defendant Braunstein.  In his prepared remarks, Defendant Braunstein acknowledged: "[T]he overall financial results for the third quarter came in below expectations management shared with investors on our last earnings call. We are obviously disappointed by this performance and we have to do better."

65.     Following these press releases and the Q3 2021 conference call, Talkspace's stock price fell $1.23 per share, or 36.28%, to close at $2.16 per share on December 16, 2021.

66.     Subsequent to, and due to, the closing of the Merger, the price of Talkspace common stock declined precipitously as the truth about Talkspace and the Proxy's false and misleading nature were revealed over time.  By December 30, 2021, the price of Talkspace common stock was trading below $2 per share, 80% below the price shareholders would have received if they had redeemed their shares instead of approving the Merger less than one year earlier.

67.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise

acquired Talkspace securities during the Class Period, and/or all holders as of the May 19, 2021 record date that were entitled to vote on the Merger at the June 17, 2021 special meeting of shareholders. Excluded from the Class are Defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

69.    The members of the Class are so numerous that joinder of all members is impracticable. As of the close of business on the record date, there were 51.75 million outstanding shares of HEIC's common stock. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Talkspace or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

72.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants as alleged herein;

24

- whether statements made during the Class Period and/or in the Proxy misrepresented material facts about the business, operations, and prospects of Talkspace;

- whether the Individual Defendants, HEC, and/or the HEC Sponsor caused Talkspace to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Talkspace securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

74.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Talkspace securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Talkspace securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

75.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

76.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Talkspace securities; and

(iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Talkspace securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

80.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Talkspace securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Talkspace's finances and business prospects.

81.     By virtue of their positions at Talkspace, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

82.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Talkspace, the Individual Defendants, HEC, and/or the HEC Sponsor had knowledge of the details of Talkspace's internal affairs.

83.     The Individual Defendants, HEC, and/or the HEC Sponsor are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants, HEC, and/or the HEC Sponsor were able to and did, directly or indirectly, control the content of the statements of Talkspace.  As officers and/or directors of a publicly-held company, the Individual Defendants, HEC, and/or the HEC Sponsor had a duty to disseminate timely, accurate, and truthful information with respect to Talkspace's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Talkspace securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Talkspace's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Talkspace securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

84.     During the Class Period, Talkspace securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Talkspace securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Talkspace securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class.  The market price of Talkspace securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants)**

87.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

88.    This Count does not sound in fraud.  Plaintiff does not allege that Defendants had scienter or fraudulent intent with respect to this Count as they are not elements of a Section 14(a) claim.

89.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

90.    Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

91.    By virtue of their positions within HEIC, the HEC Sponsor and Talkspace and their due diligence regarding the Merger, Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the Defendants named herein.  The Proxy misrepresented and/or omitted material facts, as detailed above.  Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

92.    As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Proxy was an essential link in the consummation of the Merger.  The Defendants also failed to correct the Proxy prior to the Merger and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

93.    As a direct result of the Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the Class were precluded from exercising their right to seek redemption of their HEIC shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger.  The false and misleading Proxy used to obtain shareholder approval

of the Merger deprived Plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their HEIC shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning the true value of Talkspace, which was far below the operational assets that shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy that Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

94.     The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

95.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants, HEC, and the HEC Sponsor)**

96.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

97.     Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled

person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

98.     By reason of the allegations herein, the Individual Defendants, HEC and the HEC Sponsor violated Sections 10(b) and 14(a) of the Exchange Act by issuing and publishing the Proxy and materially false and misleading statements during the Class Period, which contained untrue statements of material fact concerning the Merger and omitted to state material facts concerning the Merger necessary in order to make the statements made in the Proxy not misleading.

99.     The Blank Check Sponsor Defendants, other than Defendant HEC Fund, were controlling persons of HEIC, and Defendants Frank and Hirschhorn were controlling persons of Talkspace prior to and leading up to the Merger within the meaning of Section 20(a) of the Exchange Act.

100.    Moreover, the Individual Defendants, by virtue of their high-level positions as officers and/or directors of HEIC and/or Talkspace, as detailed herein, participated in the operation and management of HEIC and/or Talkspace, and conducted and participated, directly and indirectly, in the conduct of the business affairs of HEIC and/or Talkspace, and therefore exercised general control over the operations of HEIC and/or Talkspace.  The Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of HEIC and/or Talkspace, including the identification of target companies to be acquired by HEIC, the evaluation of Talkspace, and the content and dissemination of the Proxy, which Plaintiff contends was false and misleading.

101.    Likewise, HEC and the HEC Sponsor, as the private equity sponsor of the IPO and the Merger, and due to their influence and control over the Board, ownership of HEIC shares and relationships with HEIC's management, exercised general control over the operations of the

Company and its business affairs. HEC and the HEC Sponsor, either directly or indirectly through their affiliates, established HEIC, selected HEIC's management and the members of the Board, granted themselves substantial benefits in the IPO and the Merger, participated in the identification of target companies to be acquired by HEIC, evaluated Talkspace, and influenced and controlled the drafting of the Proxy, which Plaintiff contends was false and misleading.

102.    The Defendants named herein, by virtue of their positions as owners, officers and/or directors of HEIC and/or Talkspace, had the power or ability to control the issuance, publication and contents of the Proxy. These Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Defendants named herein reviewed and considered concerning the Merger. The Defendants named herein had the ability to prevent the issuance of materially false and misleading statements concerning Talkspace during the Class Period and the materially misleading Proxy or to cause the Proxy or those Class Period statements to be corrected so that they were not in violation of Sections 10(b) and 14(a) of the Exchange Act.

103.    By virtue of the foregoing, the Individual Defendants, HEC, and the HEC Sponsor violated Section 20(a) of the Exchange Act, and Plaintiff is entitled to relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Designating Plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Declaring that the Proxy distributed by Defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and Section 14(a) of the Exchange Act;

C.      Awarding Plaintiff and other members of the Class damages together with interest thereon;

D.      Awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

E.      Awarding Plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  January 31, 2022                                    Respectfully submitted,

                                                                        POMERANTZ LLP

                                                                        */s/ Jeremy A. Lieberman*
                                                                        Jeremy A. Lieberman
                                                                        J. Alexander Hood II
                                                                        James M. LoPiano
                                                                        600 Third Avenue, 20th Floor
                                                                        New York, New York 10016
                                                                        Telephone: (212) 661-1100
                                                                        Facsimile: (212) 661-8665
                                                                        jalieberman@pomlaw.com
                                                                        ahood@pomlaw.com
                                                                        jlopiano@pomlaw.com

                                                                        *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, <u>      Luis Diaz Valdez                           </u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Talkspace, Inc. ("Talkspace" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Talkspace securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Talkspace securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Talkspace securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

DocuSign Envelope ID: 4CBA3B21D2B-4aveC40840rPAG699tDocument 1   Filed 01/31/22   Page 36 of 38

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** 12/22/2021
_____
               **(Date)**

DocuSigned by:

1898B39CF974496...

**(Signature)**

Luis Diaz Valdez

**(Type or Print Name)**

Talkspace, Inc. (TALK)                                                                    Luis Diaz Valdez

**List of Purchases and Sales**

| Ticker | Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| HEC | Purchase | 2/5/2021 | 200 | $11.3700 |
| HEC | Purchase | 2/5/2021 | 200 | $11.3200 |
| HEC | Purchase | 2/9/2021 | 200 | $11.9358 |
| HEC | Purchase | 2/9/2021 | 100 | $11.8000 |
| HEC | Purchase | 2/9/2021 | 100 | $11.7500 |
| HEC | Purchase | 2/9/2021 | 100 | $11.7500 |
| HEC | Purchase | 2/9/2021 | 100 | $11.7400 |
| HEC | Purchase | 2/9/2021 | 200 | $11.6600 |
| HEC | Purchase | 2/9/2021 | 200 | $11.6400 |
| HEC | Purchase | 2/12/2021 | 7 | $11.9000 |
| HEC | Purchase | 2/12/2021 | 2 | $11.7839 |
| HEC | Purchase | 2/12/2021 | 1 | $11.6950 |
| HEC | Purchase | 2/12/2021 | 200 | $11.9701 |
| HEC | Purchase | 2/16/2021 | 200 | $11.4300 |
| HEC | Purchase | 2/16/2021 | 100 | $11.4900 |
| HEC | Purchase | 2/16/2021 | 100 | $11.5100 |
| HEC | Purchase | 2/16/2021 | 100 | $11.5300 |
| HEC | Purchase | 2/16/2021 | 100 | $11.5799 |
| HEC | Purchase | 2/16/2021 | 100 | $11.5899 |
| HEC | Purchase | 2/16/2021 | 100 | $11.6800 |
| HEC | Purchase | 2/16/2021 | 100 | $11.7300 |
| HEC | Purchase | 2/16/2021 | 90 | $11.9400 |
| HEC | Purchase | 2/19/2021 | 200 | $11.1989 |
| HEC | Purchase | 2/24/2021 | 4 | $10.6850 |
| HEC | Purchase | 2/24/2021 | 6 | $10.6800 |
| HEC | Purchase | 2/24/2021 | 16 | $10.6800 |
| HEC | Purchase | 2/24/2021 | 24 | $10.6850 |
| HEC | Purchase | 2/24/2021 | 100 | $10.6799 |
| HEC | Purchase | 2/25/2021 | 2 | $10.3850 |
| HEC | Purchase | 2/25/2021 | 2 | $10.3800 |
| HEC | Purchase | 2/25/2021 | 30 | $10.3850 |
| HEC | Purchase | 3/1/2021 | 16 | $10.6189 |
| HEC | Purchase | 3/2/2021 | 100 | $10.4850 |
| HEC | Purchase | 3/17/2021 | 200 | $10.0950 |
| HEC | Purchase | 3/17/2021 | 100 | $10.0982 |
| HEC | Purchase | 3/31/2021 | 24 | $9.9000 |
| HEC | Sale | 3/29/2021 | (3) | $9.9400 |
| HEC | Sale | 3/29/2021 | (21) | $9.9400 |
| HEC | Sale | 2/5/2021 | (400) | $11.9000 |
| HEC | Sale | 2/11/2021 | (1,000) | $11.8900 |
| TALK | Purchase | 7/6/2021 | 80 | $7.6199 |
| TALK | Purchase | 7/14/2021 | 150 | $5.9986 |
| TALK | Purchase | 7/14/2021 | 50 | $5.9895 |
| TALK | Purchase | 7/14/2021 | 70 | $5.9684 |
| TALK | Purchase | 7/14/2021 | 150 | $5.9150 |
| TALK | Purchase | 7/15/2021 | 10 | $5.9392 |
| TALK | Purchase | 7/15/2021 | 40 | $5.9100 |
| TALK | Purchase | 7/15/2021 | 100 | $5.8950 |
| TALK | Purchase | 7/19/2021 | 50 | $5.6620 |
| TALK | Purchase | 7/23/2021 | 300 | $6.0100 |
| TALK | Purchase | 7/30/2021 | 200 | $5.8200 |
| TALK | Purchase | 7/30/2021 | 30 | $5.9899 |
| TALK | Purchase | 7/30/2021 | 40 | $5.9599 |
| TALK | Purchase | 7/30/2021 | 30 | $5.9900 |
| TALK | Purchase | 7/30/2021 | 100 | $6.0400 |
| TALK | Purchase | 7/30/2021 | 50 | $5.8400 |
| TALK | Purchase | 7/30/2021 | 10 | $5.8000 |
| TALK | Purchase | 7/30/2021 | 40 | $5.8399 |
| TALK | Purchase | 8/13/2021 | 500 | $5.2250 |

**Talkspace, Inc. (TALK)**                                                                                          **Luis Diaz Valdez**

### List of Purchases and Sales

| Ticker | Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|--------|------------------|------|-----------------------|----------------------|
| TALK | Purchase | 8/25/2021 | 18 | $5.2399 |
| TALK | Purchase | 8/25/2021 | 2 | $5.2354 |
| TALK | Purchase | 8/25/2021 | 60 | $5.2351 |
| TALK | Purchase | 8/26/2021 | 920 | $5.1750 |
| TALK | Purchase | 9/8/2021 | 400 | $5.3982 |
| TALK | Purchase | 9/9/2021 | 500 | $5.3181 |
| TALK | Purchase | 9/9/2021 | 100 | $5.2900 |